**ÆTNA LIFE INS. CO. OF HARTFORD, CONN., v. PERRON.**

**No. 5053.**

Circuit Court of Appeals, Seventh Circuit. Feb. 23, 1934.

Rehearing Denied April 13, 1934.

Don Kenneth Jones and Wilfred M. Doherty, both of Chicago, Ill., for appellant.

Edward Sonnenschein, Herbert M. Lautmann, and Isaac E. Ferguson, all of Chicago, Ill., for appellee.

Before SPARKS and FITZHENRY, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Appellant seeks to reverse a judgment in favor of appellee as plaintiff in a suit upon an insurance policy upon the life of Leo P. Perron, now deceased. Two errors are assigned, viz., that appellant's motion for a directed verdict should have been allowed and that the court erred in its charge to the jury.

Appellant, by special pleas, asserted falsity of statements made by the insured in answer to questions 9, 10, and 13 of the application and in the final paragraph thereto, and insisted that they constituted fraudulent misrepresentations of material facts, barring appellee's action upon the policy.

Question No. 9 in the application, dated January 7, 1929, was, "Have you consulted a physician or practitioner for or suffered from any ailments or disease of: a. Brain or Nervous system? b. Heart, Blood Vessels or Lungs? c. Stomach, Intestines, Liver, Kidneys or Bladder? d. Enlarged glands, Tumors, Goitre, or Ulcers? e. Rheumatism or Gout?" with blanks for answer under the headings: "Yes or No, Name of disease, No. of attacks, Date, Duration, Severity, Results (if within 5 yrs., name and address of every physician consulted)." The deceased answered "No" opposite each ailment "a" to "e," inclusive, and nothing further except the word "mumps," opposite the first "No." He named no physicians or practitioners consulted.

Question 10 was "Have you consulted or been examined or treated by any physician or practitioner not named above within the last five years?" with blanks for answer under the headings: "Yes or No; Name and Address of Each; Date; Reason for Consultation, Examination or Treatment." The applicant answered "Yes";—"1923"; "Herniotomy, right, in Germany. Good result," and inserted nothing under the heading "Name and Address of Each."

Question 12 was "Have you ever been an inmate of any hospital or sanitarium? (If yes, state why and when.)" The applicant answered "No."

At the conclusion of the application, before the signature of the deceased, appeared the following statement: "I hereby certify that the above answers and statements are made by me, that they are correctly and fully recorded by the Medical Examiner, and that no material circumstance or information has been withheld or omitted concerning my past and present state of health and habits of life."

The application was, by its terms and by those of the policy, made a part of the latter, which issued on January 16, 1929. The policy was incontestable after it had been in force for a period of one year.

The insured died within the year, on December 18, 1929. The attending physician Dr. True, stated in the proofs of loss that death was due to scleroderma, Addison's disease, and terminal pneumonia; that the health of the insured became impaired in May, 1929; that the latter had been under observation at the Mayo Clinic in July and August and at Billings Memorial Hospital in April, 1929, and that an autopsy had been performed.

The undisputed evidence was that on July 26, 1927, the insured consulted Dr. Talbot; that he was then and for several months had been experiencing intermittent swelling of both hands and tenderness thereof upon pressure; that he then obtained a prescription of the physician and again consulted Dr.

Talbot in October, 1927; that there was then no change. On January 9, 1928, the physician, again consulted, made a tentative diagnosis of vasomotor impairment (inclusive of any automatic nerve disorder), thought possibly to arise from food sensitization or protein basis and recommended that Mr. Perron go to a hospital.

The insured was admitted to St. Luke's Hospital in Chicago on January 22, 1928, assigned to a room and discharged as unimproved on January 24th, with a diagnosis of possible Burgher's disease. He complained of intermittent tenderness of the skin of the hands, intermittent swelling of the hands, lasting from a few days to a few weeks, numbness and swelling of the hands at night, and intermittent cramping sensation in the left foot. He had noticed for the first time that winter that cold weather affected his hands, producing numbness in the middle three fingers, absolute in the left hand but not so severe in the right. On brisk massage the sensation gradually disappeared. He reported that for three or four years past he had had sixteen to twenty attacks of a cramping sensation in the middle toe of the left foot, lasting each time from a few minutes to an hour, and several times in the preceding two or three years he had experienced intermittent attacks of dyspnœa in the morning. He mentioned as previous operations, herniotomy, four years before, and tonsilectomy, six years before. At that time there were physical examinations and tests of urine and blood and a resulting working diagnosis of Burgher's disease and possible Raynaud's disease. The blood had a high uric acid content.

The deceased was again readmitted to the hospital on September 16, 1928, and discharged September 21st, unimproved, with an undetermined diagnosis. The complaints were the same as in January, plus a painful swelling of both breasts. The physical findings were the same as before except that both breasts were definitely swollen and very sensitive to touch. There were examinations of stomach, urine, stool, and blood, and a metabolism test. The physician found a basal metabolism rate of 21.8 below normal. The working diagnosis at this time was parathyroid deficiency and possible Burgher's disease. The insured was directed to return Sunday and every other day for further determinations. One capsule of thyroid before each meal was prescribed.

The insured returned to the hospital September 23, 1928. Upon his discharge September 24, 1928, he was unimproved and the diagnosis undetermined. His basal metabolism rate for that date was 15.5 per cent. below normal. He returned to the hospital September 25, 1928. On September 26th, he left on a pass, returning the next evening, with instructions to continue the dosage while away. His condition upon discharge September 29th, was improved and the diagnosis hypothyroidism. While at the hospital, he was given Kalzin tablets and desiccated thyroid. The diagnosis then was hypothyroidism. His metabolism rate on that date was 2.3 per cent. above normal.

Dr. Talbot, during one of the hospital periods, made a tentative diagnosis of gout. Raynaud's disease, suspected by the physicians, results in local spasm of the arteries and, if allowed to progress, will end in necrosis or gangrene of the extremity involved. The fact that the insured's breasts were so enlarged as to be almost of the feminine type and tender suggested hypopituitarism. He had been comparatively impotent for six months. Dr. Talbot, when he last saw the insured on February 15, 1929, had not arrived at a satisfactory diagnosis, but he considered Mr. Perron involved in a very complicated glandular situation. A low blood pressure indicated some endocrine gland involvement. The desiccated thyroid prescribed was intended to correct an indicated hypothyroidism. The possible Burgher's disease, indicated by some of the symptoms, is a disease of the blood vessels in which the blood becomes occluded and which ends in gangrene.

After the visits at St. Luke's Hospital, on February 27, 1929, deceased went to the Billings Memorial Hospital Clinic. At that time he complained as before, saying he had had tenderness and swelling of the breasts and tenderness of the soles of his feet for a year, sexual disturbances, nightly emissions intermittently for five years, and loss of sexual power for about a year.

The final cause of insured's death was nephritis (Bright's disease) and terminal pneumonia, which usually results at the end, following some other condition or disease.

These facts, coupled with other details appearing in the record, furnish a clear concept of the situation at the time the insured made his application. Mr. Perron was even then afflicted with some baffling trouble, accompanied by symptoms, indicating a complicated glandular involvement, not understood by the medical profession, in the then existing stage of development of the science of that profession. Though he exhibited

none of the outward signs of disease and attended to his business as usual, he had consulted various physicians and undergone several periods of observation, examination, and test in the hospital. Working and tentative diagnoses of Raynaud's disease, gout, Burgher's disease, parathyroid deficiency, hypothyroidism, Addison's disease, vasomotor impairment, possible endocrine gland disturbance, and schleroderma had been made by the various physicians he consulted. Consequently his answer to question 9 was clearly false, not to be justified by any meticulous process of reasoning or nice distinction of terms. No man understanding the English language could have failed to comprehend the clear import of the query. He had consulted physicians about ailments, wherein those consulted found indicated heart affection. He had consulted physicians about ailments, concerning which doctors suspected gout.

In answering question 10 he was asked to give the names and addresses of physicians by whom he had been examined or treated, not named in the answer to the preceding question within a five-year period. He failed to name any one of the various doctors whom he had consulted. His beneficiary cannot excuse this flagrant suppression of material facts by specious reasoning that the question is ambiguous or misleading or the answer capable of any construction consistent with good faith.

As to question 13 there is much said about the meaning of "inmate" of a hospital. True this defendant received principally examination and observation and only little therapeutic medicine. But a hospital is a place where ailments are cared for. A well man has no place therein. The first step in modern treatment of any complicated physical trouble, is the ascertainment of the cause. Therein modern medical science has progressed; it seeks first to diagnose, then to cure. Here for a year or more skilled physicians, in various hospitals and clinical tests, had, by use of modern hospital facilities, endeavored to perform the first step, and failed. The insured had a complicated condition; he was not cured; indeed his trouble was not even yet satisfactorily diagnosed. Can his beneficiary, in the face of this hospitalization, this consultation of physicians, this oft-repeated and always frustrated attempt to analyze his ills, insist that he was not an inmate because the hospital authorities never attempted to cure him? Is hospitalization any less hospitalization because its purpose is the first step in treatment of physical ills, diag-

nosis, instead of the second, cure? We know of no justification of a definition of the word "inmate," restricting the meaning by the limitation "not for diagnosis, but for therapeutic treatment."

When the deceased certified that his answers were full and correct and that no material circumstances or information concerning his past or present state of health or habits had been withheld or omitted, he was well aware that he had had physical troubles and symptoms of sufficient materiality to cause him to consult physicians and undergo hospitalization several times. Surely, if these circumstances were so material to him, they were equally material to one insuring his life. His beneficiary cannot be heard, in the face of these facts, to say that perhaps he thought the circumstances immaterial.

These facts being established, it follows as a matter of law that the appellee could not recover and the trial court should have directed a verdict for appellant. It was well said by the court in Ætna Life Ins. Co. v. Kimble et al., 16 F.(2d) 214, 215 (C. C. A. 3) that:

"The statements made by the deceased were simply not true, and the policy was issued on this untruthful statement. To such a situation this court has simply to apply to this case the law and conclusions reached by the Supreme Court in Mutual Co. v. Hilton, 241 U. S. 613, 624, 36 S. Ct. 676, 680, 60 L. Ed. 1202, namely: 'Beyond doubt, an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties. * * * Considered with proper understanding of the law, there is no evidence to support a verdict against petitioner (defendant), and the trial court should have directed one in its favor.' "

See, also, Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 36 S. Ct. 676, 60 L. Ed. 1202; Fountain & Herrington v. Mutual Life Ins. Co. of N. Y. (C. C. A. 4) 55 F.(2d) 120, 123; Haddad v. N. Y. Life (C. C. A. 6) 42 F.(2d) 651, 652; Ætna Life Ins. Co. v. Bolding (C. C. A. 5) 57 F.(2d) 626, 627; Farrell v. Security Mutual Life Ins. Co. (C. C. A. 2) 125 F. 684.

This court recently announced the requirements upon the part of the applicant in Perkins v. Prudential Insurance Co., 69 F.(2d) 218, wherein it said:

"Her theory is that the questions in the application have reference only to serious illnesses, and in effect means that an insured is

not bound to disclose every minor ailment which he considers would have no bearing on the risk. With this theory we can not agree. The application asks certain specific questions as to whether or not the insured is in good health, whether he has had any illness or injury since the policy was issued, and whether he has had any medical or surgical treatment. It does not qualify these questions with reference to the seriousness of conditions for which the insured may have been under medical or surgical care. Certainly the insurer does not expect to permit its insured to be the judge of that in all cases, and to assume the burden of proving in any case where a negative answer was given that insured knew that in fact the condition for which he had consulted a physician was a serious one. The first question referred to here might well be considered as calling for an answer as to insured's own idea of his state of health, but the second and third are in a different category. The insurer has a right to know whether the insured has had occasion to consult a physician for any reason whatsoever, and to find out for itself whether or not the risk has been impaired since it first issued the policy."

In view of what has been said, it becomes unnecessary to discuss other errors assigned.

The judgment is reversed. The appellant will have judgment for costs.